UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PROYECTO CCC EMPALME I, S.A.P.I. DE C.V., <br><br> Petitioner, <br><br> v. <br><br> COMISIÓN FEDERAL DE ELECTRICIDAD, <br><br> Respondent. | No. 1:24-CV-09739-LAP |

## <u>PLAINTIFF PROYECTO CCC EMPALME I, S.A.P.I. DE C.V.'S.'S REPLY MEMORANDUM OF LAW IN SUPPORT OF PETITION TO CONFIRM AND ENFORCE FOREIGN ARBITRAL AWARD</u>

Bernardo M. Cremades Román
B. CREMADES & ASOCIADOS
Goya 18, 2d Floor
28001 Madrid, Spain
T: +34 914 237 200

*Attorneys for Proyecto CCC
Empalme I, S.A.P.I. de C.*

I.      **ARGUMENT**

A.      **The Court Has Personal Jurisdiction Over Respondent[1]**

1.      **Confirmation of a Foreign Arbitral Award is a Summary Enforcement Proceeding, and the Due Process Analysis Must Reflect That Distinction.**

CFE contends that personal jurisdiction must comply with the Fifth Amendment's Due Process Clause. However, CFE ignores the critical distinction between a plenary merits action and a summary confirmation proceeding, a distinction that fundamentally shapes the due process analysis.

A petition to confirm a foreign arbitral award under the New York and/or Panama Convention is not an action to adjudicate liability. It is a summary enforcement proceeding in which the court does not conduct discovery, hold a trial, or make merits findings. Under 9 U.S.C. § 207, the court "shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement."[2] As the Supreme Court recognized in *Shaffer v. Heitner*, "[o]nce it has been determined by a court of competent jurisdiction that the defendant is a debtor of the plaintiff, there would seem to be no unfairness in allowing an action to realize on that debt" in the enforcing forum. 433 U.S. 186, 210 n.36 (1977); *see also* Silberman & Simowitz, *What Hath Daimler Wrought?*, 91 N.Y.U. L. Rev. 344, 362 (2016) ("[F]rom a due process perspective, *Shaffer* can be understood more generally to justify a separate jurisdictional standard for [foreign arbitral award] recognition and enforcement.").

In a plenary action, a defendant faces extensive discovery, protracted litigation, and a determination of fault. A confirmation proceeding does not concern the underlying foreign conduct at all; those questions have been resolved. The Court's sole task is to determine whether

---

[1] Despite Respondent's claim, Petitioner did not grant that Respondent is not an alter ego of Mexico (see Opp. at 7), and does not do so now. Instead, Petitioner contends that even if CFE is not considered an alter ego, personal jurisdiction still exists.

[2] 9 U.S.C. § 302 incorporates this language into application of the Panama Convention.

1

the award should be reduced to a judgment under Article V's narrow defenses (under either Convention). The due process analysis must account for this difference.

     a)  *Fuld*'s "Meaningful Relationship" Discussion Arose in Plenary Litigation and Should Not Govern Confirmation Proceedings

CFE's due process argument rests principally on *Fuld v. Palestine Liberation Organization*, 606 U.S. 1 (2025), which CFE reads as establishing a "meaningful relationship" requirement. But *Fuld* arose in a fundamentally different procedural context, namely a plenary tort action seeking to adjudicate liability for incentivizing terrorist attacks, 606 U.S. at 8–9, and should not be imported wholesale into the confirmation context.

The Supreme Court decision directly addressing the jurisdictional framework for confirmation of a foreign arbitral award is instead *CC/Devas (Mauritius) Ltd. v. Antrix Corp. Ltd.*, 605 U.S. 223 (2025). In *Devas*, the Court held that under the FSIA, personal jurisdiction is "automatic" when an exception to sovereign immunity applies and service is properly effected, with no separate minimum contacts inquiry required. *Id*. at 226, 232–34. Because Respondent acknowledges the arbitration exception applies (Opp. at 16)[3] and Petitioner effected proper service,[4] *Devas* supports jurisdiction. *Devas* declined to address whether the Fifth Amendment imposes any additional limitation because the argument had not been raised below. *Id.* at 237.[5]

---

[3] While Petitioner maintains that the commercial activity exception under § 1605(a)(2) independently supports jurisdiction, that question need not be resolved because Respondent's own concession establishes jurisdiction under the FSIA.

[4] Respondent has agreed not to dispute service. ECF No. 13.

[5] Respondent argues that the *Devas* Court recognized that the arbitration section lacks any domestic nexus requirement or any connection between a dispute in the U.S., and thus satisfying the arbitration exception does not automatically satisfy Fifth Amendment due process requirements. Opp. at 16. Quite critically, the *Devas* Court said no such thing, and Petitioner invites the Court to review Respondent's citation to confirm this mischaracterization.

CFE contends that *Fuld*, decided shortly after *Devas*, filled the gap *Devas* left open. But *Fuld* did not involve the FSIA or a confirmation proceeding. Its discussion of a possible "meaningful relationship" requirement arose in the context of initial liability adjudication in a plenary tort action, with attendant burdens of discovery, trial, and contested factual and legal issues wholly absent from this proceeding.

CFE also cites *Rashid v. Qatar Airways Group Q.C.S.C.*, but *Rashid* acknowledged that "the FSIA itself does not require additional jurisdictional analysis" and relied entirely on pre-*Devas* authorities. No. 25-cv-10109-ADB, 2025 WL 3687755 (D. Mass. Dec. 19, 2025), at *4. The Supreme Court's holding in *Devas* undermines those authorities. Further, like many of Respondent's authorities, *Rashid* concerned a plenary tort action, not a confirmation proceeding under the FSIA. In sum, *Rashid*, a district court decision from Massachusetts with no precedential weight in this Circuit, is not persuasive.

By contrast, the most relevant post-*Fuld* decision in this District supports Petitioner. In *Orient Plus Int'l Ltd. v. Baosheng Media Grp. Holdings Ltd.*, the court adopted the Second Circuit's "sufficient nexus" test as the post-*Fuld* standard under the Fifth Amendment, asking whether jurisdiction would be "arbitrary or fundamentally unfair." 808 F. Supp. 3d 609, 619-620 (S.D.N.Y. 2025). The court warned against "a thinly disguised minimum-contacts test, which the *Fuld* Court explicitly rejected," and held that where Congress authorizes extraterritorial jurisdiction, "the 'burden is a heavy one' for a defendant seeking to show that extraterritorial application of the statute violates due process." *Id.* at 619-20. The "ultimate question" is whether requiring CFE to appear would be "so unrelated to American interests as to render [it] arbitrary or fundamentally unfair." *Id.* at 620. It plainly would not: this is a summary confirmation proceeding arising from CFE's own voluntary agreement to arbitrate under a Convention framework that both the United States and Mexico have adopted.

3

> b) Even If *Fuld* Applies, It Did Not Establish Any Fifth Amendment Limitation on Jurisdiction

Even assuming *Fuld*'s framework extends to confirmation proceedings, CFE overstates what *Fuld* held. The Court "decline[d] to define the contours of" the due process inquiry, stating only that courts must engage in "a more flexible jurisdictional inquiry" than minimum contacts. 606 U.S. at 16, 18. Its discussion of a "meaningful relationship" was an observation that the facts before it were *sufficient*, not a holding that such connections are constitutionally *necessary*.

Critically, the Court did not even reject the possibility that the Fifth Amendment imposes *no* limitations on federal jurisdiction, acknowledging that the Due Process Clause may impose "no territorial limits," but stating it "need not embrace" that "maximalist theory" to decide the case before it. *Id.* at 18. *Fuld* thus left open the very question CFE treats as settled.

> c) Even If *Fuld* Established a "Meaningful Relationship" Requirement, the New York and Panama Conventions Provide a Stronger Jurisdictional Foundation Than the Statute Upheld in *Fuld*

Even if this Court reads *Fuld* as establishing a "meaningful relationship" requirement for confirmation proceedings, that standard is satisfied. In *Fuld*, the Court emphasized that the PSJVTA (i) reflected coordinate political branch action in foreign affairs; (ii) was "suitably limited"; (iii) tied jurisdiction to "specific, narrow conduct"; and (iv) "put [defendants] on full notice" that they could bs subject to personal jurisdiction. 606 U.S. at 16–19. Each feature is present here, and in several respects the case for jurisdiction is stronger.

*Coordinate political branch action in foreign affairs.* In enacting the FSIA and ratifying the New York and Panama Conventions, Congress and the President subjected foreign states and their instrumentalities to suit in U.S. courts for enforcement of arbitral awards as part of a framework to honor treaty commitments and facilitate cross-border commerce. This is the type

of coordinate action *Fuld* found entitled to "the strongest of presumptions and the widest latitude of judicial interpretation." *Id.* at 19 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)).

*Suitably limited jurisdiction.* Confirmation proceedings are narrower than the PSJVTA. They do not adjudicate merits but enforce a pre-existing obligation under Article V defenses. The FSIA's arbitration exception for foreign awards operates only when the agreement or award is governed by an international agreement or treaty. Far from "anything-goes," confirmation ties jurisdiction to the specific circumstance of a foreign state having agreed to arbitrate. *Id*. at 21.

*Consent and notice.* Unlike the PSJVTA defendants, CFE voluntarily agreed to arbitrate under a regime contemplating cross-border enforcement. Consent is "a recognized basis for the exercise of personal jurisdiction," *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985). CFE is a state-owned entity of a sovereign that adopted both Conventions and committed to the enforcement framework in fellow contracting States' courts. Nor can CFE claim surprise: the Conventions have been in force for decades. *See Fuld*, 606 U.S. at 22 (finding it significant that defendants were "put . . . on full notice they could be subject to personal jurisdiction"); *Orient Plus*, 808 F. Supp. 3d at 623 ("[A]s that obligation on issuers' directors has stood for nearly a century, the [defendants] certainly had 'fair warning' that their extraterritorial conduct could expose them to" U.S. litigation).

*Important national policy interests and burden.* The United States' commitment to enforcing foreign arbitral awards serves the "important foreign policy concerns" *Fuld* credited. *See Devas*, 605 U.S. at 230 (the [Conventions] "require[]" enforcement of qualifying awards). Moreover, the PSJVTA subjects defendants to plenary litigation, whereas confirmation involves no merits adjudication and limits defenses to Article V. If the PSJVTA satisfied due

5

process notwithstanding far greater burdens, confirmation under a treaty the respondent's sovereign ratified must satisfy due process *a fortiori*.

### 2. The "Meaningful Relationship" Inquiry Must Focus on CFE's Relationship with the Forum, Not the Situs of the Underlying Commercial Contract

Even if the statutory and treaty-based framework discussed above were insufficient, CFE's own contacts separately satisfy whatever standard applies. CFE argues this dispute lacks a "meaningful relationship" with the United States because both parties are Mexican, the Contract was performed in Mexico, the arbitration was seated in Mexico, and the dispute was governed by Mexican law. But CFE conflates whether the underlying dispute has a U.S. nexus with whether the *award debtor* has a sufficient nexus for a confirmation proceeding. Only the latter is relevant.

Even accepting that due process requires a 'meaningful relationship' between the defendant, the dispute, and the United States, in the confirmation context the "dispute" is not the original commercial controversy but whether a valid award should be reduced to a judgment. *See* Silberman & Simowitz, 91 N.Y.U. L. Rev. at 375 ("[I]n a recognition and enforcement proceeding, the underlying controversy has been decided. . . . The relevant controversy . . . is the outstanding judgment or award."). If the test requires a nexus between the *original commercial activity* and the United States, no foreign arbitral award between foreign parties could ever be confirmed here regardless of the debtor's forum contacts—a result flatly inconsistent with the Conventions' pro-enforcement framework.

CFE's reliance on *Zhongzhi Hi-Tech Overseas Inv. Ltd. v. Shi*, No. 22-CV-6977 (LAP), 2023 WL 4561812 (S.D.N.Y. July 17, 2023) (Preska, J.) is unavailing. *Zhongzhi* rested on a minimum contacts framework that is no longer applicable after *Devas*. *Id.* at *2-3. It also did not involve the FSIA or a state-owned entity, and unlike the respondent there, CFE has

identifiable U.S. contacts including financing agreements, hedging transactions, and bond issuances with New York institutions. See section I.B. below.

In short, even setting aside the statutory and treaty-based analysis in Section A.1 above, CFE's own voluntary participation in U.S. financial markets, combined with its agreement to arbitrate under a framework contemplating cross-border enforcement, independently establishes the requisite relationship between CFE, this proceeding, and the United States.

### 3.    The Exercise of Jurisdiction over CFE is Reasonable

CFE argues jurisdiction would be unreasonable under *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102 (1987). At the outset, *Fuld* did not hold that a reasonableness inquiry is required under the Fifth Amendment; it stated only that the Fifth Amendment "might entail a similar inquiry." 606 U.S. at 23. As *Orient Plus* observed, "[w]here . . . a non-diversity action is brought under a federal law which provides for nationwide service of process, '[t]he reasonableness inquiry is largely academic . . . because of the strong federal interests involved.'" 808 F. Supp. 3d at 617. "[O]nly rarely have courts declined jurisdiction, on fairness grounds, in such cases." *Id.* at 618. (citation omitted). Even assuming such an inquiry applies, CFE's analysis fails because it treats this confirmation proceeding as if the Court were adjudicating the underlying Mexican construction dispute.

CFE emphasizes that both parties are Mexican and all evidence is in Mexico. But the merits have been decided; the only question is whether the award should be confirmed, a legal determination resolved on briefing. Of note, Respondent has made no defense under Article V of either Convention.

The *Asahi* factors also favor jurisdiction: (1) the burden on CFE is modest: briefing Article V defenses (which CFE decided not to do), not mounting a plenary defense; (2) the United States has a significant interest in enforcement under the Conventions (*see Devas*, 605 U.S. at 230); (3) Petitioner has a strong interest in effective relief, given that Mexican law

prohibits domestic attachment of CFE's assets (*see* Opp. at 2); (5) efficiency is served where the legal questions require no foreign evidence; and (6) the shared interest of Convention signatories supports jurisdiction.

### B. Venue in S.D.N.Y. is Proper

Venue is proper under 28 U.S.C. § 1391(f)(3) because Respondent is "doing business" in New York. In arguing to the contrary, Respondent relies on authorities that either predate controlling law or are inapplicable to foreign sovereign instrumentalities under the FSIA.

As a threshold matter, "doing business" under § 1391(f)(3) does not mean general personal jurisdiction or minimum contacts. The statute applies specifically to agencies and instrumentalities of foreign states and asks only whether the entity is "doing business" in the district. Courts have agreed that this standard is equivalent to the "commercial activity" concept used within the FSIA—a broader standard than general jurisdiction. *Altmann v. Republic of Austria*, 142 F. Supp. 2d 1187, 1214–15 (C.D. Cal. 2001), aff'd and remanded, 317 F.3d 954 (9th Cir. 2002). Respondent's attempt to import the standard for general personal jurisdiction under N.Y. C.P.L.R. § 301 into the FSIA venue provision is therefore misplaced. See Opp. at 21. Every authority Respondent cites for this proposition—*Clarke v. Fonix Corp., Glencore AG v. Bharat Aluminum Co., Westerman v. Grow, and Trizna v. New York, C. & St. L.R. Co.*—involves private corporate defendants and general venue or jurisdiction provisions, not § 1391(f)(3) or the FSIA. None is on point. Opp. at 21–22.

Respondent also contends that its bond issuance is "deemed to occur outside the United States" under 17 C.F.R. § 230.903(a) and that "doing business" requires "significance and continuity," citing Judge Winter's concurrence in *COMMISA v. Pemex*, 832 F.3d 92, 117–18 (2d Cir. 2016). Opp. at 21. Both arguments fail.

First, Respondent's reliance on Regulation S to argue that its bond issuance is "deemed to occur outside the United States" is misplaced. Regulation S governs securities registration

8

requirements for offshore transactions; it does not determine whether a foreign sovereign is conducting commercial activity for FSIA venue purposes.

Second, CFE's bond activities in New York are neither isolated nor recent. Respondent's own declarant concedes that CFE "has entered into financing agreements and hedging transactions with New York-based financial institutions, and recently engaged the latter to issue Rule 144A/Regulation S bonds." Grayeb Decl. ¶ 7; Opp. at 2. CFE's own disclosures reveal the scale of this activity: as of September 2025, CFE had approximately **$7.5 billion** in outstanding U.S. dollar-denominated bonds.[6] OM at F-38. These bonds were issued under multiple series spanning the past decade, all under indentures dated from June 16, 2015, with Deutsche Bank Trust Company Americas as trustee at its New York office. OM at 110, F-135-136. Most recently, in January 2026, CFE issued an additional $1.5 billion in notes under the same indenture. OM at pdf 3.

Respondent's declarant emphasizes that the January 2026 notes "are expected to be listed on the Luxembourg Stock Exchange" (Grayeb Decl. ¶ 7), but this obscures the reality. The Luxembourg listing is ancillary; the primary clearing and settlement of the notes runs through The Depository Trust Company ("**DTC**") in New York. OM at 135. The notes are offered to qualified institutional buyers in the United States under Rule 144A. OM at pdf 4. And the governing terms are rooted in New York: the notes are governed by the law of the State of New York (OM at 128-129); CFE submitted to the exclusive jurisdiction of Manhattan federal courts and waived immunity (OM at 128-129); and the trustee, paying agent, transfer agent, and registrar are all Deutsche Bank Trust Company Americas at its New York office (OM at 128–29).

---

[6] The "**OM**" refers to the Final Offering Memorandum for CFE's January 2026 bond issuance (https://www.cfe.gob.mx/finanzas/financiamiento/Documents/Emisiones%20Internacionales/CFE%20-%20Final%20Offering%20Memorandum2.pdf).

Until the notes are paid in full, CFE will maintain a principal paying agent, transfer agent, and registrar in New York City. OM at 128. CFE also irrevocably designated the Consul General of Mexico (New York office), located at 27 East 39th Street, New York, New York 10016, as its authorized agent to accept service of process in connection with actions relating to the notes. OM at 128-129.

These bond activities are in addition to CFE's contract-specific New York contacts alleged in the Petition. See Petition, ¶¶ 8, 11-12.

These facts demonstrate not "discrete financial transactions," but a comprehensive, decade-long commercial undertaking in this district. CFE has maintained New York law-governed instruments totaling billions of U.S. dollars, a New York trustee and paying agent, submission to Manhattan federal courts, and a New York service agent continuously since at least 2015. This is the sustained commercial activity § 1391(f)(3) contemplates. Respondent cites the *COMMISA* concurrence, which found that "thirty-five bond issuances" for "$9.5 billion" satisfied § 1391(f)(3). Opp. at 21. But that case did not hold that this level is the floor; it simply found it sufficient. CFE's own disclosures show $7.5 billion in outstanding bonds with extensive ongoing New York obligations—a figure comparable to the very threshold Respondent invokes as adequate.

Accordingly, venue in the Southern District of New York is proper under § 1391(f)(3). Respondent's attempts to narrow the "doing business" standard by importing inapplicable general jurisdiction doctrines, misapplying securities regulations, and dismissing billions of dollars in New York-anchored commercial activity as "discrete transactions" should be rejected.

### C.    If the District of Columbia is Considered Proper Venue, the Action Should be Transferred

Should this Court determine that proper venue lies in the District of Columbia, the action should be transferred, not dismissed. "[C]ourts overwhelmingly favor transfer where dismissal risks statute-of-limitations prejudice," and the three-year limitations period here expired on March 14, 2026. *See* Opp. at 22 n.5 (acknowledging the "overwhelmingly favor" principle). Respondent nevertheless urges dismissal, arguing that Petitioner may simply seek recognition of the Mexican court judgment confirming the arbitral award. Opp. at 22. That argument is flawed for several reasons.

Confirming an arbitral award under the New York and Panama Conventions is a fundamentally different action from enforcing a foreign court judgment. The arbitration exception to the FSIA, 28 U.S.C. § 1605(a)(6), is the principal basis for jurisdiction in this proceeding. If Petitioner were forced to pursue enforcement of a Mexican court judgment instead, it may face CFE's rejection of the arbitration exception and therefore the issue will likely be litigated.

There is also a significant risk that Petitioner would lose the ability to argue that Respondent waived sovereign immunity by agreeing to arbitrate a dispute governed by the New York and Panama Conventions. Although such implied waiver is currently recognized in this Circuit, *see Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. v. Navimpex Centrala Navala*, 989 F.2d 572, 581–83 (2d Cir. 1993), a petition for certiorari is currently pending before the U.S. Supreme Court that squarely presents the question of whether foreign sovereigns impliedly waive immunity from actions to recognize foreign judgments confirming arbitral awards. See Pet. for Writ of Cert., *Amaplat Mauritius Ltd. v. Zimbabwe Mining Dev. Corp.*, No. 25-699 (U.S. filed Dec. 12, 2025). Should the Supreme Court rule against implied waiver, Petitioner would be left without a viable path to enforcement in the United States.

11

Dismissal would thus risk significantly hampering Petitioner's ability to collect the sums owed, precisely the prejudice courts seek to avoid when "overwhelmingly" favoring transfer. It would also impose unnecessary delays and costs, as Petitioner would need to wait for Mexican proceedings to conclude before restarting U.S. proceedings.

Finally, Respondent's suggestion that dismissal is warranted because Petitioner gave "cursory treatment" to venue (Opp. at 22) is meritless. As demonstrated above, there is substantial basis for venue in this District, and Petitioner's decision to file here was deliberate.

## II.    **CONCLUSION**

For the reasons set forth in the Petition and this Reply, Petitioner respectfully requests that the Court grant the Petition.

Dated: April 28, 2026
Madrid, Spain

Respectfully submitted,

By: /s/ Bernardo M. Cremades Román
Bernardo M. Cremades Román
B. CREMADES & ASOCIADOS
Goya 18, 2d Floor
28001 Madrid, Spain
T: +34 914 237 200

*Attorneys for Proyecto CCC Empalme I, S.A.P.I. de C.*

## WORD COUNT CERTIFICATION

I, Bernardo M. Cremades Román, an attorney duly admitted to practice before this Court, hereby certify that this brief complies with the word count limit set forth Section 2.B. of the Individual Rules of Judge Loretta A. Preska and Local Rule 7.1(c) of this Court, because it contains 3,497 words (exclusive of the caption, table of contents, table of authorities, signature blocks and certificates). In preparing this certification, I have relied on the word count of the word processing system used to prepare this affirmation.

Dated: April 28, 2026                    B. CREMADES Y ASOCAIDOS, S.L.
      Madrid, Spain

                                    By: /s/ Bernardo M. Cremades Román
                                    Bernardo M. Cremades Román

13